UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAUL E. POLAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 04 C 5143 |
| v. ) | |
| ) | Judge John W. Darrah |
| THE UNIVERSITY OF CHICAGO, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Paul Polak, filed suit against Defendant, The University of Chicago, alleging age discrimination and retaliation. Presently before the Court is the University's Motion for Summary Judgment.

## BACKGROUND

The University is a large private post-secondary institution with a range of schools and programs, consisting of undergraduate training, advanced degrees, as well as research. (Def.'s 56.1(a)(3) Statement ¶ 13). Research programs are headed by faculty with varying research interests and are primarily funded through grants obtained by faculty principal investigators. (Id., ¶ 14). Program size, including research team staffing, change as funding becomes more or less available. (Id., ¶ 15).

Polak, born June 30, 1950, graduated with a bachelor of science from Purdue University in 1975. (Def.'s 56.1(a)(3) Statement ¶¶ 17-18). Polak began his employment with the University in 1976 as a research technician in the Neurology Department. (Id., ¶ 19).

In 1981, Polak was promoted to Senior Research Technician. (Def.'s 56.1(a)(3) Statement ¶ 21). In addition to his duties as a research technician, Polak began supervising students. (Id., ¶

22). In 1988, Polak's supervisor, Sarah Szuchet, approached Polak to see if he was interested in an academic position with the University. (Id., ¶ 23). Typically, academic positions are reserved for individuals with PhDs or MDs. (Id., ¶ 25). Polak accepted the academic position, and his first title was Assistant Professor. (Id., ¶¶ 28, 30). In 1990, Polak was promoted to Research Associate Assistant Professor. (Id., ¶ 33). Polak's programs were funded by start-up funds and grants. (Id., ¶ 35).

Szuchet's project was not renewed, and she was forced to find her own funding for the program. (Def.'s 56.1(a)(3) Statement ¶ 36). Polak knew of this; and in 1998, he began looking for a new position. Polak learned that Dr. Michael Thirman was hiring another person for the laboratory in the Hematology and Oncology Department. (Id., ¶ 37). Polak sought other employment because he knew that if Szuchet's program ran out of funding, the laboratory would cease to exist. (Id., ¶¶ 39-40).

Polak sought a position as a Research Associate Assistant Professor in hematology and oncology, although he had little experience in the field. (Id., ¶¶ 45, 48). Polak was aware the appointments for the positions were for a three-year term. (Id., ¶ 50).

Polak and Dr. Thirman met and discussed the position. Dr. Thirman indicated that the program was funded through start-up funds from Burroughs-Welcome and the National Institute of Health ("NIH"). (Def.'s 56.1(a)(3) Statement ¶ 52). Polak was offered the position in Dr. Thirman's laboratory in June of 1998. (Id., ¶ 54). On July 14, 1998, Polak signed a memorandum, which stated that his options at the completion of his three-year appointment included appointment to Senior Research Associate, transfer to staff, or termination. (Id., ¶ 55).

When Polak began working in Dr. Thirman's laboratory, Federico Simone and Roger Luo, both Research Associates, were working in the laboratory. (Def.'s 56.1(a)(3) Statement ¶ 56). In October 1998, Joseph Kaberlein began working in the laboratory as a Research Technician. (Id., ¶ 57). In 1999, Canadan Akar joined the lab as a Research Associate. (Id., ¶ 58).

Polak's title of Research Professional is a PhD-level position. (Plaint.'s 56.1(b)(3) Statement ¶ 1). Polak was the oldest lab employee Dr. Thirman ever had working in his laboratory, and Polak had the most years working in a laboratory. (Id., ¶¶ 3-4). Polak did work in Dr. Thirman's laboratory outside of microscopy, including general laboratory work, growing cells in tissue culture, labeling of cells for fluorescent imaging, and some antibody purification. (Id., ¶ 5).

As a staff employee, Polak was entitled to ten sick days per year. If any of the days were not used, they would carry-over to the next year. (Def.'s 56.1(a)(3) Statement ¶ 59). Polak did not know what the changes in sick leave benefits would be if he accepted an academic position. (Id., ¶ 60). Employees in academic positions do not receive sick days, nor are sick days carried-over when an employee is promoted from a staff position to an academic position. (Id., ¶ 61). In January 2003, Polak filed a complaint with the University regarding sick leave after he discovered that he was no longer entitled to accrue sick days in his academic position. Polak's complaint was reviewed by a three-member panel, who upheld the decision that Polak would not be allowed to accrue sick time, per the University's policy. (Id., ¶ 63)

Dr. Thirman solicited bridge-funding to support his lab, receiving $120,000 for the one-year period of January 1, 2003 through December 31, 2003. (Def.'s 56.1(a)(3) Statement ¶ 69). In March 2003, Mike Joren, the Section Administrator, requested a meeting with Dr. Thirman to discuss Dr. Thirman's budget shortfall. (Id., ¶ 70). Joren informed Dr. Thirman that he needed to either find

more grant money or cut spending. (Id., ¶ 71). Dr. Thirman had funding sources available for purposes of having multiple people working on multiple projects. Luo had specific funding available to him so he did not need additional funding. (Def.'s 56.1(a)(3) Statement 145). At this time, Dr. Thirman's grants were becoming exhausted so funding was limited. In light of the limited funding, Dr. Thirman's staff was working on multiple aspects of different projects. (Id., ¶ 146). Polak was funded 70 percent by Burroughs-Welcome and 30 percent by NIH. Kaberlein was funded 100 percent by Burroughs-Welcome. Simone was funded 100 percent by NIH. Luo was funded 62 percent by a grant solely to be used for his salary and 38 percent by NIH. Luo's grant terminated on June 30, 2003. The Burroughs-Welcome grant terminated on August 31, 2003; and the NIH grant terminated in January 2004. (Plaint.'s 56.1(b)(3) Statement ¶ 19). The majority of the work that Polak performed over the course of his four-and-a-half years that he worked in the lab was spent on confocal microscopy. (Id., ¶ 142

Dr. Thirman told Joren that the laboratory had stopped doing confocal microscopy and that he did not anticipate the need for the procedure in the future. Dr. Thirman further indicated that, given the funding situation, he needed to layoff Polak. (Def.'s 56.1(a)(3) Statement ¶ 72). Human Resources informed Dr. Thirman that if he was going to layoff Polak, he needed to give Polak a one-month notice. (Id., ¶ 73).

On April 3, 2003, Polak was informed that his position would be eliminated effective May 1, 2003, due to lack of funding. (Def.'s 56.1(a)(3) Statement ¶ 74). Two main factors contributed to Polak's layoff: budgetary constraints and the lack of need for Polak's set of skills. (Id., ¶ 75). At the time of his layoff, Polak was 53 years old. (Id., 84). Polak's salary was noticeably higher than all of the other researchers. (Id., ¶ 86).

By September 2003, Dr. Thirman's laboratory was reduced from six members to three members. (Def.'s 56.1(a)(3) Statement ¶ 85). The three employees that no longer worked in the laboratory included Polak, Akar, and Sam Binion, a dishwasher. (Id., ¶ 87). Simone, Luo, and Kaberlein all had different research titles than Polak and were specifically classified as Research Technician, Sr. 11-BSD; Research Associate; and Research Technician, respectively. (Id., ¶ 89). All three of the individuals who were retained worked on ELL, ELL2, and MLL and had more relevant experience to the future needs of the laboratory. (Id., ¶ 90). Simone and Luo obtained PhD degrees and were working as post-doctoral fellows in the laboratory when Polak joined the project. (Id., ¶ 91). At the time of Polak's layoff, the laboratory was focusing on gene cloning. (Id., ¶ 92). Luo worked in gene cloning and assembling complex vectors in Dr. Thirman's laboratory. (Id., ¶ 80). Simone and Kaberlein also did gene cloning. (Id., ¶¶ 81-82). Kaberlein also performed preparatory work for many of Simone's and Luo's research work. (Id., ¶ 93). Dr. Thirman thought Simone, Luo, Kaberlein, and Polak were all productive members of his laboratory. (Plaint.'s 56.1(a)(3) Statement ¶ 22).

During discussions regarding Polak's complaint about the loss of sick time, Polak complained that a June 30, 2003 memorandum jointly written by Dr. Thirman and Joren outlining the financial constraints of the laboratory and the reason for the layoff, referred to Polak being "grandfathered" without a doctorate as an exception to the employment policy. (Def.'s 56.1(a)(3) Statement ¶ 97). Polak felt that the term "grandfathered" was discriminatory, even though he understood that the term refers to an exception to the PhD requirement. (Id., ¶ 99). Dr. Thirman is in his late 40s, and Joren is in his mid-40s. (Id., ¶ 100).

5

Polak claims that Luo, Simone, and Kaberlein made a comment about Polak's gray hair and bald spot. (Def.'s 56.1(a)(3) Statement ¶ 101). Polak also claims that Simone asked Polak if he could squat down on two legs, stick out one leg and stand back up again. (Id., ¶ 102). Polak did not complain about the comments. Polak avers that Dr. Thirman witnessed the comments, which Dr. Thirman denies. (Id., ¶ 104; Plaint.'s Response ¶ 104; Dr. Thirman's Dep. pp. 144-45). After his layoff, Polak met and/or spoke with Sandy Bateman (the head of personnel), the secretary to the President of the University, Dr. Thirman, and Dr. Rowley. Polak did not complain at those times that he believed he was laid off because of his age. (Def.'s 56.1(a)(3) Statement ¶¶ 105-08).

Since his layoff, Polak applied for approximately 80 positions that were posted on the University's website. (Def.'s 56.1(a)(3) Statement ¶ 111). Thirty-three of the positions for which Polak applied for were cancelled without being filled. (Id., ¶ 112). In June 2003, Polak met with Mary Quinn, Human Resources Director, and Ken Sherrigan, Associate Dean of Biological Sciences. Polak indicated that he had been unsuccessful in obtaining any position with the University. (Id., ¶ 114). Quinn informed Polak that more experienced candidates had been hired in the positions. (Id., ¶ 115). Quinn recommended that Polak state his layoff status and identify the positions for which he had applied and had previously held on his resume. (Id., ¶ 116). Quinn also told Polak that he should pay more attention to the qualifications of the position and target his job search more carefully. (Id., ¶ 117). However, Quinn also told Polak to apply to some positions for which he may not be qualified. (Plaint.'s 56.1(b)(3) Statement ¶ 39). Quinn also gave Polak feedback on the Director of Academic Affairs position for which Polak had applied. Quinn informed Polak that only candidates who had substantial administrative, legal, or human resources experience were interviewed. (Def.'s 56.1(a)(3) Statement ¶ 118).

6

On September 15, 2003, Polak filed a charge of age discrimination against the University. On May 7, 2004, Polak received a Notice of Right to Sue from the Equal Employment Opportunity Commission. (Complaint ¶¶ 7, 9).

Polak believes that Sherrigan may have been aware of his age discrimination complaint. (Def.'s 56.1(a)(3) Statement ¶ 120). However, Polak cannot identify any specific fact that shows that Sherrigan knew of the age discrimination complaint. (Id., ¶ 121). Sherrigan would decide who would be hired for the Director of Academic Affairs position for which Polak had applied. (Id., ¶ 123). Polak had no previous experience working in human resources; and Patricia Shymanski, who was the successful candidate for the position, had extensive prior experience in human resources. (Id., ¶¶ 123-125).

In January or February 2004, Polak interviewed with Dr. Todd Kroll on three occasions over the phone and in person for a position in Dr. Kroll's laboratory. (Def.'s 56.1(a)(3) Statement ¶ 127). Polak did not receive an offer for the position because Dr. Kroll believed that Polak had poor communication skills and that Polak was not an impressive candidate for the position. (Id., ¶ 128). Dr. Kroll was unaware of Polak's discrimination complaint and had not heard any negative comments about Polak. (Id., ¶¶ 129-30).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family*

*Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

*Age Discrimination Claim*

A plaintiff alleging age discrimination can avoid summary judgment using either the "direct method" or "indirect method." *Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004) (*Gusewelle*). Under the direct method of proof, a plaintiff may show, either by way of direct or circumstantial evidence, that his employer's decision to take an adverse job action against him was motivated by the impermissible purpose of age. Direct evidence is evidence that proves discriminatory conduct by the employer without reliance on inference or presumption.

Isolated comments should be "causally related to the . . . decision making process." *Grier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996). A plaintiff must establish that all of the alleged comments were in some manner related to the employment decision. *See McCarthy v. Kemper Life Ins.*, 924 F.2d 683, 687 (7th Cir. 1991). Without such proof, the remarks, alone, do not give rise to an inference of discrimination even if spoken by the ultimate decision-maker. *See Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993). There must be a nexus between the alleged comments and the employment decision. *See Randall v. LaSalle Tele., Inc.*, 876 F.2d 563, 567 (7th Cir. 1989).

Circumstantial evidence is evidence sufficient to create a convincing mosaic that allows a

fact-finder to infer intentional discrimination by the decision-maker. *See Gusewelle*, 374 F.3d at 574. Such circumstantial evidence must "point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Store, Inc.*, 324 F.3d 935, 939 (7th Cir. 2004) (*Adams*). Three types of circumstantial evidence relevant to discrimination cases have been identified. *See Troupe v. May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994) (*Troupe*). The first is "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." The key consideration is the totality of these "pieces of evidence[,] none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe*, 20 F.3d at 737. The second type is "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Troupe*, 20 F.3d at 726. Third is "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 726.

Under the indirect method of proof, from the familiar *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. To do this, a plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) a similarly situated employee not in the protected class was treated more favorably. *See Steinhauer v. Degolier*, 359 F.3d 481, 484 (7th Cir. 2004) (*Steinhauer*). If the plaintiff meets this burden, the burden shifts to the defendant to articulate a legitimate,

9

nondiscriminatory reason for its actions. If the defendant can do so, the burden shifts back to the plaintiff to show that the defendant's proffered reason for its actions is a pretext for discrimination. *See Steinhauer*, 359 F.3d at 484.

Polak argues that he has presented circumstantial evidence sufficient to permit a fact-finder to infer intentional discrimination by Dr. Thirman. The circumstantial evidence includes: (1) Polak was laid off even though the grant for his position was available for a longer period than other laboratory workers, (2) he was the most experienced and prolific member of the lab, (3) he worked harder than the others, and (4) Dr. Thirman ignored improper behavior of other laboratory workers. Polak also identifies certain comments (set out above) as discriminatory: co-workers mentioned Polak's gray hair, bald spot, asked if he could squat and stand on one leg, and used the term "grandfathered" in a meeting.

Polak has failed to demonstrate direct evidence of discrimination based on the above circumstantial evidence. There is no evidence of suspicious timing of Polak's layoff that correlated with a lack of funding and the cessation of Polak's main work – confocal microscopy research. Nor did Dr. Thirman make any ambiguous statements or exhibit any behavior that can be inferred to be discriminatory. Polak stresses his abilities and work ethic as being far above his co-workers and Dr. Thirman's failure to act on, what Polak perceived as, his co-workers' improper comments of discrimination. However, there is no factual dispute that Dr. Thirman's decision as whom to lay off was not based on work product and conduct; instead, it was based on the financial constraints of the projects, the work needed for the projects, and the necessary skills of the laboratory employees. Dr. Thirman believed all members of his staff were competent and determined that his highest paid laboratory worker was the most appropriate staff member to lay off considering the future projects

10

and the staff members' job skills. Furthermore, the use of the term grandfathered, as conceded by Polak, was used to refer to an exception to an employment requirement (as is it is commonly used); there is no evidence that it referred in any way to Polak's age. Polak also presents no evidence that other employees similarly situated to Polak, other than in age, systematically received better treatment by Dr. Thirman.

As to the third type of circumstantial evidence, Polak claims the circumstantial evidence discussed above demonstrates that Dr. Thirman's reason for laying off Polak is a mere pretext for discrimination.

A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

Polak argues that Dr. Thirman's reason for the layoff was a pretext to discrimination because Polak was a hard, ethical worker as compared to the other laboratory workers and because the balance and grant assignments demonstrate that Polak should have been the third employee laid off, not the first. As discussed above, the decision to lay off Polak was a lack of funding and the laboratory employees' skills necessary to complete the projects. Neither Polak's nor his co-employees' work product or ethical standards were the basis of Dr. Thirman's decision. Dr. Thirman believed all of his employees were productive members of his laboratory, and the evidence

11

establishes beyond factual dispute that he chose to lay off Polak because he received the highest salary and lacked the required set of skills. Furthermore, Dr. Thirman funded the laboratory through multiple means, and his staff worked on multiple projects regardless of the specific source for a staff member. While Dr. Thirman's decision that Polak was the employee that was to be laid off under the circumstances was contrary to what Polak wished or may have decided, Polak has failed to demonstrate that Dr. Thirman's decision was a pretext to discrimination; and the evidence is decidedly to the contrary.

Polak's failure to demonstrate that a genuine issue of material fact exists as to whether Dr. Thirman's reason for termination was a pretext for discrimination also prevents Polak from prevailing on his discrimination claim under the indirect method of proof. *See Steinhauer*, 359 F.3d at 484.

Based on the above, Polak has failed to demonstrate a genuine issue of material fact exists as to his age discrimination claim.

*Retaliation Claim*

A plaintiff may also establish a retaliation claim through either a direct or indirect method of proof. To establish retaliation under the direct method of proof, a plaintiff must offer evidence that (1) he engaged in a statutorily protected activity, (2) he was subjected to an adverse employment action, (3) and that a causal connection exists between the two events. *See Scaife v. Cook County*, 446 F.3d 735, 741 (7th Cir. 2006). Under the indirect method of proof, a plaintiff can establish a *prima facie* case of retaliation by showing that: (1) he engaged in a statutorily protected activity; (2) he applied for and was qualified for a position, (3) he was not hired for the position, and (4) a

similarly situated individual who did not engage in a statutorily protected activity was hired for the position. *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 812 (7th Cir. 2005).

The parties do not dispute that Polak has established the first two elements. As to the causal connection, Polak argues that some individuals, such as Bateman and Sherrigan, knew of his age discrimination claim and that he was qualified for the approximately forty positions for which he had applied. However, Polak has failed to establish that any of the individuals who were aware of his age discrimination complaint were involved in deciding who would be chosen for the positions for which he had applied. Although Polak applied for thirty-three positions that were cancelled by the University, Polak has not shown that these positions were cancelled to avoid hiring him in retaliation for his age discrimination claim. Polak has not even shown that the interviewers of the decision-makers were aware of Polak's discrimination claim. Other than his conclusory statement that he was qualified for all of the positions for which had applied, Polak presents no evidence that he was qualified for those positions, including what the positions were.

Lastly, Polak has not established that he was qualified for the positions for which he had applied or that a a similarly situated individual who did not engage in a statutorily protected activity was hired for the position.

Based on the above, Polak has failed to demonstrate a genuine issue of material fact exists

as to his retaliation claim.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted.

Dated: October 30, 2006

JOHN W. DARRAH
United States District Court Judge